1
2
3                                                                    O
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   GILDARDO G. F.,                          Case No.  2:17-cv-05991-KES

12              Plaintiff,

13        v.                                   MEMORANDUM OPINION AND
                                                         ORDER
14   NANCY A. BERRYHILL, Acting
     Commissioner of Social Security,[1]
15
                Defendant.
16

17

18                                     I.

19                              BACKGROUND

20        Gildardo G. F. ("Plaintiff") suffered a traumatic brain injury in 2008 as the

21   result of a motor vehicle accident.  Administrative Record ("AR") 42, 379-81, 409.

22   He had no earnings in 2010 or 2011; at that time, he was married with four children

23   and was a "stay at home dad."  AR 61, 479.  From July 2011 to October 2011, he

24   worked as a kitchen assistant for Vocational Improvement Program, Inc. ("VIP"), a

25   non-profit corporation that helps people with disabilities find jobs.  AR 273, 278,

26        _____

          [1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy
27   Commissioner for Operations, performing the duties and functions not reserved to
     the Commissioner of Social Security."
28

                                         1

357.  VIP helped him obtain a job at Home Depot which he held from January 2012 through February 2014 when he resigned because he thought he was going to be fired.  AR 50-51, 276, 306.  He got divorced in 2013.  AR 56.

On February 21, 2014, Plaintiff applied for supplemental security income ("SSI") alleging disability commencing February 7, 2014, the day after his separation from Home Depot.  AR 174-78, 276.  On November 17, 2015, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE").  AR 38-81.

On March 15, 2016, the ALJ issued a decision denying Plaintiff's SSI application.  AR 18-37.  The ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "history of traumatic brain injury, major depressive disorder, organic affective disorder, mood disorder, anxiety, and history of marijuana abuse."  AR 20.  Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 416.967(c) with the following limitations:

> [H]e can lift and/or carry up to 50 pounds occasionally and 25 pounds
> frequently; he can stand and/or walk approximately six hours of an
> eight-hour workday and he can sit for approximately six hours of an
> eight-hour workday with normal breaks; he is limited to simple
> routine and repetitive tasks involving simple, work-related decisions
> and few, if any, workplace changes, but would be able to sustain
> attention and concentration skills sufficient to carry out work-like
> tasks with reasonable pace and persistence; he must work in a low
> stress environment defined as a work environment that involves no
> demands for high production rate or pace work such as assembly line
> work; and no interaction with the public, occasional interaction with
> co-workers that do not involve tandem tasks, and occasional

interaction with supervisors.

AR 23.

Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could not perform his past relevant work as a Home Depot sales attendant. AR 30. The ALJ found, however, that Plaintiff could work as a laundry laborer, Dictionary of Occupational Titles ("DOT") 361.687-018; industrial cleaner/janitor, DOT 381.687-018; and kitchen helper, DOT 318.687-010. AR 31. The ALJ concluded that Plaintiff was not disabled. Id.

## II.

## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required

to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

## III.

## ISSUES PRESENTED

Plaintiff's appeal presents the following two issues: (1) whether the ALJ properly evaluated the medical evidence concerning Plaintiff's mental impairments; and (2) whether the ALJ properly evaluated Plaintiff's subjective symptom testimony. (Dkt. 18, Joint Stipulation ["JS"] at 4.)

## IV.

## SUMMARY OF MENTAL HEALTH EVIDENCE

The ALJ found that some medical source opinions and Plaintiff's testimony about the limiting effects of his condition were inconsistent with other evidence in the record. The Court summarizes that evidence in advance of discussing the ALJ's analysis.

### A. **Home Depot Evidence.**

The Home Depot staff who interviewed Plaintiff scored him a 3 or 4 on a scale of 1-5. AR 285-91. Plaintiff signed an acknowledgement of wage/hour and security policies and an orientation checklist. AR 292-96. He successfully completed the "in-aisle assessment for D25." AR 298. In January 2013, he received a generally favorable performance review. AR 300-01. In July 2013, he received an excellent review with no categories marked "needs improvement." AR 304-05. In January 2014, his performance review indicated "needs improvement" for many categories. AR 302-03. His supervisors noted that he had failed to complete required product training, had "challenges coming to work on time" and "excessive call outs." AR 302. In 2013 and 2014, Plaintiff received disciplinary notices for repeatedly asking to leave early to attend a birthday party despite a supervisor's denying the request, failing to complete training on schedule, and arriving late and having unexcused absences on multiple days. AR 309-12.

4

Plaintiff's job at Home Depot involved helping customers in the hardware department. AR 52. Plaintiff received acceptable or excellent ratings for treating customers professionally. AR 300, 302, 304; <u>compare</u> AR 52 (Plaintiff testified that the reasons he stopped working at Home Depot were "pretty hard to explain;" he "would oftentimes laugh at customers" and "couldn't even talk to them."). Nothing in the Home Depot records indicates that Plaintiff held a sheltered job placement or could not perform his duties without special supervision. While Plaintiff testified that he thought Home Depot gave him "more leeway" than other employees (AR 54), he also admitted that "no one told" him so, and he may have been referring to warnings for coming to work late. AR 51 (testifying Home Depot would normally fire someone for 5 warnings and he had 12). The Home Depot records suggest that Plaintiff received a poor performance review in 2014 because he lacked motivation to come to work on-time, not because he lacked the mental capacity to perform his job.

B. **Activities of Daily Living.**

Plaintiff moved out of his mother's house and into his own apartment alone during the period of claimed disability.[2] AR 45. Living alone required Plaintiff to manage his own household without immediate supervision. He testified that he does laundry and cooks for himself, but he is forgetful. AR 60, 63, 65. He attends Pilates and yoga classes "a couple times" each week. AR 65. He also took a dance class at community college. AR 47.

In the function report ("FR") he completed while still living with his mother,

_____

[2] Plaintiff lived on Bixby Way in Upland, California in 2011 when he applied to work at Home Depot before he was divorced. AR 280. Plaintiff started living on Placer Place in Ontario, California on February 1, 2012, and he lived there through sometime in 2014. AR 175. This may be his mother's house, because in October 2014, Plaintiff lived with his mother. AR 410. At the time of November 2015 hearing, Plaintiff lived alone (apparently on Springfield Street in Upland). AR 59, 478.

when asked how his condition limits his ability to work, Plaintiff stated, "I can work or do anything, but I do have limitation or conditions that make things challenging." AR 211. As mental limitations, he identified forgetfulness, sadness, and "uncontrollable laughter often." Id. He also stated, "I think with practice and repetition, I can do anything …." AR 231. He used his phone and notes to remind himself of tasks. Id. As typical daily activities, he identified setting up appointments, visiting his children, "working in/out of the house, shop for food/snack, workout, or hangout w/ friends." AR 212. He prepared simple meals "daily if not weekly." AR 213. He had no problems with personal care and cared for his mom's and brother's pet dogs. Id. He performed household chores such as mowing the lawn, weeding, shopping, cleaning, and ironing. AR 213-14. He went outside every day, could shop in stores or via computer, and could drive. AR 214; see also AR 45, 233 (driving limited by lack of gas money and expired insurance). He liked to "go to parks at times and draw, write, think, play basketball, and watch other people …." AR 215. He thought he followed written instructions "very well," but tended to forget or "mix up" verbal instructions. AR 216. He reported getting along well with others. AR 216-17.

## C. **Dr. Sarah Maze's Evaluation.**

On April 25, 2014, Dr. Maze performed a neurological evaluation. AR 397-400. Dr. Maze described Plaintiff's speech as "mildly hesitant" and "messy" because "at times, he cannot say words precisely." AR 397-98. Dr. Maze also described Plaintiff as "forgetful" with "more problems" with short-term memory and "his mentation is slightly slowed." AR 398. Dr. Maze observed that Plaintiff could follow "all simple instructions" and his "intelligence does not appear impaired." AR 398. Dr. Maze did not assess any functional limitations due to mental impairment, except to say that he would function "best" in a very low stress environment with minimal contact with others. AR 400.

D. **External Situational Assessment.**

In July 2014, Plaintiff participated in an External Situational Assessment ("ESA") conducted by the San Gabriel Valley Training Center upon referral from the Department of Rehabilitation. AR 232-37. The assessment involved an interview and then trial tasks at various companies. Id.

The interviewer reported that Plaintiff was living with his mother but handling his own finances and "very independent." AR 232. Plaintiff was seeking fulltime employment and was willing to travel up to 20 miles for work. AR 233. He needed a job because he wanted to move out on his own. AR 234.

The first work trial was at Saunders-3M Tape Products. AR 233. Plaintiff was able to bag and label 129 rolls of tape "after one demonstration and minimal verbal reminders." AR 233. He found the work "easy" and complained, "Anyone can do this job, why do you have me bagging and labelling rolls of tape?" AR 233-34.

At an automotive parts store, he was asked to bag and label brake hoses. AR 235. He "became upset" and stated that he "felt like he was back at VIP, he was not an idiot." Id. He regained his composure and completed 3,000 units by the end of the workday. Id.

The next trial job was janitorial work at a warehouse. AR 235. He cleaned several restrooms and breakrooms. Id. On the drive home, he stated that he "did not want to do janitorial work" because it "'sucked' and he only wanted to work with animals." AR 236-37.

Attempting to accommodate this preference, Plaintiff's next trial job was at Petco. AR 237. Plaintiff was assigned to dust shelves, but he "was not in favor of this assignment, ended the assignment, and was transported home." Id.

The evaluators concluded that Plaintiff had attitude difficulties, but did not report any cognitive difficulties. AR 237 (reporting he had "complaints" at each worksite and felt "menial tasks are beneath him").

E. **Dr. Umugbe's Treating Records.**

In late 2014 and 2015, Plaintiff visited Dr. Umugbe at Health and Happy America Corp. several times, as follows:

• 11/13/14: Plaintiff reported that his daily moods were like a roller coaster; he was unhappy with circumstances in his life, including his ex-wife's new relationship and having no job. AR 429. He was prescribed medications. AR 430.

• 11/28/14: Plaintiff rated his depression as 7/10; he was angry at himself for cheating on his wife, causing their divorce. AR 427. He explained that he had stopped taking his medication because he was not sure if it made him feel worse, but now he "consent[ed]" to taking them. Id.

• 1/16/15: Plaintiff reported he felt "things are getting better." AR 426. He "used to smoke marijuana and drink a lot," but now felt he did "not get angry easily anymore." Id. He was taking Prozac which was "helping a little," but he told the doctor that he still did not want to take "too many medications." Id.

• 2/20/15: Plaintiff reported that he "ran out of Prozac and would like for it to be elevated." AR 425. He received another prescription and counselling on the "importance of compliance" with dosage instructions. Id. He rated his depression 3/10. Id.

• 3/20/15: He again rated his depression 3/10 and reported that "he has been going to school (Chaffey Com College) trying to prepare himself for rehab and he might be given work." AR 424. Plaintiff also said, however, that he had stopped taking Prozac and stopped seeing his counsellor. Id.

• 6/25/15: Plaintiff reported that "he was smoking marijuana but he started to become volatile" over his ex-wife's boyfriend, so "he started to Canyon for therapy and he stopped MJ and started to take his psych meds again." AR 423.

• 7/22/15: Plaintiff reported that he was attending therapy at Canyon Ridge three days/week to "stop using [marijuana] and pray and I feel better …." AR 422.

8

F. **Canyon Ridge Hospital Records.**

In June 2015, Plaintiff sought help at Canyon Ridge Hospital for depression. AR 449. Plaintiff reported his depression was caused by "ex-wife living in same apartment complex & he is seeing her with her new partner." AR 451. He reported feeling angry at his ex-wife. AR 515-18. He also reported using marijuana within the last two weeks, and he used marijuana during treatment. AR 451, 463, 472, 522. On mental status exam, Plaintiff presented with "racing thoughts" and "irritability" but no hallucinations. AR 450. He could spell "world" forwards and backwards. Id. The hospital assessed Plaintiff as having "fair" judgment and insight, "appropriate" thought content, "good" recent and remote memory, "poor" attention/concentration, and "flight of idea" thought process. AR 471. As a strength, the hospital noted "intelligence appears average or above." AR 484.

He participated in their outpatient program in August 2015. AR 447. The program provided medication management and therapy five days/week. AR 447-48. On August 5, 2015, he had made "minimal" progress towards his treatment goals. AR 540. On August 12, 2015, staff noted he had difficulties getting along with his peers. AR 542. On August 19, 2015, the staff noted "slight improvement" but "has problems with concentration and attention span." AR 548. On August 24, 2015, he was discharged from the program as "stable" with a prescription for Prozac and "no symptoms of psychosis." AR 448, 553.

# V.

# DISCUSSION

A. **ISSUE ONE: The ALJ's Evaluation of Plaintiff's Mental Impairments.**

Plaintiff contends that the ALJ failed to give a specific, legitimate reason for discounting the opinions of (1) consultative psychologist Dr. Zhang and (2) treating neurologist Dr. Ali. (JS at 6, 8.)

**1. Rules for Weighing Conflicting Medical Evidence.**

In deciding how to resolve conflicts between medical opinions, the ALJ must

consider that there are three types of physicians who may offer opinions in Social
Security cases: (1) those who directly treated the plaintiff, (2) those who examined
but did not treat the plaintiff, and (3) those who did not treat or examine the
plaintiff.  See 20 C.F.R. § 416.927(c); Lester v. Chater, 81 F.3d 821, 830 (9th Cir.
1995).  A treating physician's opinion is generally entitled to more weight than that
of an examining physician, which is generally entitled to more weight than that of a
non-examining physician.  Lester, 81 F.3d at 830.  Thus, the ALJ must give specific
and legitimate reasons for rejecting a treating physician's opinion in favor of a non-
treating physician's contradictory opinion or an examining physician's opinion in
favor of a non-examining physician's opinion.  Orn v. Astrue, 495 F.3d 625, 632
(9th Cir. 2007) (citing Reddick, 157 F.3d at 725); Lester, 81 F.3d at 830-31 (citing
Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).

        If the treating physician's opinion is uncontroverted by another doctor, it may
be rejected only for "clear and convincing" reasons.  Lester, 81 F.3d at 830 (citing
Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).  However, "[t]he ALJ
need not accept the opinion of any physician, including a treating physician, if that
opinion is brief, conclusory, and inadequately supported by clinical findings."
Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Tonapetyan v.
Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The factors to be considered by the
adjudicator in determining the weight to give a medical opinion include: "[l]ength
of the treatment relationship and the frequency of examination" by the treating
physician; and the "nature and extent of the treatment relationship" between the
patient and the treating physician.  Orn, 495 F.3d at 631 (quoting 20 C.F.R.
§ 404.1527(d)(2)(i)-(ii)); see also 20 C.F.R. § 416.927(d)(2)(i)-(ii).

        **2. Dr. Zhang.**

                a.  Summary of Dr. Zhang's Report.

        On October 1, 2014, Dr. Zhang completed a psychological evaluation of
Plaintiff.  AR 409-14.  He administered tests of memory and intelligence and

reviewed a prior neurological evaluation.  AR 409.  At the time of the examination, Plaintiff was not taking any psychotropic medication and had no history of psychiatric treatment.  AR 410.  Dr. Zhang noted, "no history of substance abuse reported."  AR 410; compare AR 49 (in November 2015, Plaintiff testified that he smoked a gram of marijuana a day in June 2015 [see AR 481] and smoked marijuana "more regularly in the past").  Plaintiff told Dr. Zhang that he suffers "daily auditory hallucinations."  AR 411.  Dr. Zhang observed that Plaintiff could spell "world" forward, but not backwards.  AR 411.

Dr. Zhang determined found that Plaintiff had a Full Scale IQ of 64.  AR 412.  Dr. Zhang noted that this was at the "extremely low range of intelligence" with 98% of the population scoring above 70.[3]  Id.  He noted, nevertheless, that the score appeared "to be a valid representation of [Plaintiff's] current intellectual functioning."  Id.  Later in the report, Dr. Zhang characterized Plaintiff as having only "mild cognitive deficits."  AR 414.  Dr. Zhang also administered a memory test on which Plaintiff's scores ranged from 66 to 74, with 98% of the population scoring above 70.  AR 412-13.  From these results, Dr. Zhang concluded that Plaintiff's memory was "mildly" impaired.  AR 413.

Dr. Zhang diagnosed Plaintiff with "major depressive disorder with psychotic features" and "cognitive disorder, NOS [not otherwise specified]."  AR 413.  Dr. Zhang concluded that Plaintiff had no impairment carrying out simple instructions, but had "marked" impairments performing work without special supervision and responding appropriately to work situations and changes.  AR 414.  He also found

---

[3] An IQ score of 70 is the "accepted level for intellectual disability."  Hall v. Florida, __ U.S. __, 134 S. Ct. 1986, 2003 (2014).  As a further point of reference, persons impaired before age 22 may qualify as disabled under Listing 12.05 subpart C if they have a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

that Plaintiff was not capable of managing funds independently. Id.; compare AR 214 (Plaintiff stating in March 2014 that he could handle a savings account, pay bills, and count change, attributing his money difficulties to the fact that he was not "currently employed").

### b. The ALJ's Treatment of Dr. Zhang's Report.

The ALJ discussed Dr. Zhang's report and relied on portions of it to formulate Plaintiff's RFC, including assessing Plaintiff's ability to carry out simple instructions. AR 27-28, 414. Overall, however, the ALJ gave Dr. Zhang's report "less than significant weight because it is not consistent with the record as a whole, particularly with respect to the marked limitations." AR 28. The ALJ identified what parts of the record she found to be inconsistent with Dr. Zhang's report, specifically noting "the [Plaintiff's activities of daily living], current independent living, and prior work at Home Depo" are inconsistent with very low IQ score of 64 assigned by Dr. Zhang. Id. The ALJ also found Canyon Ridge Hospital's assessment that Plaintiff had average or above-average intelligence (AR 484) inconsistent with an IQ of 64. AR 26.

Plaintiff argues that the fact he needed VIP's assistance to obtain the job at Home Depot is consistent with Dr. Zhang's opinion that he is markedly impaired working without special supervision. (JS at 7-8.) The Home Depot records, however, show that once Plaintiff obtained the job, he performed many aspects of it satisfactorily without any special supervision. AR 300-05. Plaintiff argues that his "arriving late, failing to complete training, etc." must have been caused by his impairments because "what else would it be related to?" (JS at 19.) Many unimpaired employees have trouble with punctuality and completing boring assignments, like training, due to a lack of motivation or discipline. Here, Plaintiff's statements to the ESA evaluators (i.e., that menial work was "easy" but uninteresting) suggest that the problem was Plaintiff's attitude, not the residual effect of a brain injury in 2008.

12

Plaintiff also argues that the ESA supports Dr. Zhang's opinion because the evaluators concluded that Plaintiff "is not ready for work at this time." (JS at 8, citing AR 237.) The evaluators, however, reached this conclusion due to Plaintiff's unwillingness to do unskilled work and poor attitude, not due to Plaintiff's displaying mental impairments that disabled him from doing unskilled work. AR 237.

Plaintiff also argues that the ALJ impermissibly offered her own medical opinion when she concluded that an IQ score of 64 was inconsistent with Plaintiff's work history and activities. (JS at 6.) One does not need a medical degree, however, to conclude that someone capable of driving, renting an apartment alone, using a computer to shop, taking fitness classes, and holding a job at Home Depot has an IQ higher than the lowest 2% of the population. AR 45, 65, 214, 233, 276. Even if Plaintiff needs to use his smart phone to set reminders for himself (JS at 7), his ability to do so weighs against a finding of intellectual disability.

### 3. Dr. Mohsen Ali.

On June 20, 2014, Dr. Ali provided a one-page letter. AR 401. He stated that he first saw Plaintiff in August 2008 after his car accident and continued treating him through 2014. Id. The letter recites Plaintiff's subjective complaints. Id. The letter concludes, "Therefore from the neurological point of view the patient is considered disabled and he is unable to engage in any gainful employment." Id.

The ALJ gave Dr. Ali's letter "little weight" because the ultimate opinion of disability presented in it was not in keeping "with the Social Security Administration's precise disability guidelines" and the letter did not "address the listings or any exertional or non-extensional limitations." AR 28. The ALJ also noted that the decision that a claimant is disabled is reserved to the Commissioner. Id.

Plaintiff asserts that Dr. Ali "opined" that Plaintiff "displayed inappropriate behaviors and would have problems participating in work-type environments" and

that the ALJ did not adequately address these opinions. (JS at 8-9.) Plaintiff, however, mischaracterizes Dr. Ali's letter which actually states that Plaintiff complained of these issues to Dr. Ali. AR 401. The sole statement in Dr. Ali's letter regarding Plaintiff's functioning is the conclusion that Plaintiff "is considered disabled and he is unable to engage in any gainful employment." Id.

The ALJ correctly noted that Dr. Ali's letter does not discuss the Listings, federal disability guidelines, diagnosed impairments, or any functional limitations observed by Dr. Ali. The letter does not provide any medical opinions about specific exertional or non-exertional limitations that might be expected to flow from Plaintiff's conditions or alleged symptoms. This lack of detail and objective support was a specific and legitimate reason for the ALJ to give Dr. Ali's conclusory letter little weight. Furthermore, the ALJ properly found that the conclusion that Plaintiff was disabled is an issue reserved to the Commissioner, and therefore not entitled to controlling weight or any special significance. See 20 C.F.R. § 416.927(d)(1) ("[a] statement by a medical source that you are …'unable to work' does not mean that we will determine that you are disabled"), (d)(3) (an opinion on an issue reserved to the Commissioner is not entitled to any special significance).

B. **ISSUE TWO: Plaintiff's Subjective Symptom Testimony.**

**1. Rules for Evaluating Subjective Symptom Testimony.**

An ALJ's assessment of pain level is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (citation omitted); see also Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted).

If the ALJ finds that a claimant's testimony as to the severity of his pain and impairments is unreliable, "the ALJ must make a credibility determination with

findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas, 278 F.3d at 958. If the ALJ's credibility finding is supported by substantial evidence in the record, courts may not engage in second-guessing. Id.

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

Here, the ALJ issued his decision on March 15, 2016. At that time, Social Security Ruling ("SSR") 96-7p had not been superseded by SSR 16-3p (which superseded SSR 96-7p on March 28, 2016). The Court notes that the SSR changes appear immaterial to the ALJ's analysis in this case. Both SSRs note that, in assessing a claimant's subjective symptom testimony, ALJs should consider, in addition to the objective medical evidence: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the

15

individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

## 2. Summary of Plaintiff's Testimony.

Plaintiff testified that after a car accident in May 2008, he experienced severe short-term memory problems, depression, sleep deprivation, emotional outbursts (anger and uncontrollable laughing), and a lack of balance. AR 211-20. Because of these conditions. Plaintiff reported an inability to find or hold work and to recall material including the contents of books, dance routines, recipes, and verbal instructions. AR 47, 48, 55-57, 211-20. Plaintiff testified about problems sleeping through the night. AR 212. Plaintiff also testified to needing both written and electronic reminders for daily activities. AR 57-58.

## 3. The ALJ's Evaluation of Plaintiff's Testimony.

The ALJ found that while Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's testimony "concerning that intensity, persistence, and limiting effects of these symptoms are not entirely credible…." AR 24. The ALJ gave at least six reasons supporting this finding: (1) Plaintiff's demeanor at the hearing, (2) the quality of Plaintiff's writing in his FR and prepared statements, (3) inconsistency with Plaintiff's independent living situation and daily activities, (4) inconsistency with mental health treatment notes from November 2014 and February, June and July 2015 (Dr. Umugbe's treating records at AR 422-23, 425, 429), (5) inconsistency with his "work record," and (6) Plaintiff's inconsistent statements. AR 28-30. Considered collectively, these reasons provided a sufficiently clear and convincing basis for discrediting Plaintiff's subjective symptom testimony.

## 1. **Reason One**:  **Plaintiff's Demeanor at the Hearing.**

The ALJ found that Plaintiff's demeanor at the hearing was inconsistent with his alleged disabilities, as follows:

> [A]t the hearing, [Plaintiff] was lucid and responsive to questioning. [Plaintiff's] answers demonstrated good memory recall and logical thinking, as his answers were relevant and responsive.  [Plaintiff's] demeanor and testimony also reflected good social interaction and concentration, persistence and pace.  [Plaintiff] was also cooperative, voluntarily offered information, and seemed at ease with the hearing process.

AR 30.  Thus, the ALJ explained how Plaintiff's demeanor at the hearing was inconsistent with his symptom testimony.  For example, Plaintiff testified that he had severe short-term memory problems, but the ALJ observed that his answers demonstrated good memory.  Compare AR 60-61 and AR 47 (Plaintiff recalled what classes he had taken), AR 49-50 (Plaintiff recalled his substance use), AR 50-52 (Plaintiff recalled his job at Home Depot).  Plaintiff testified that he could not work because of problems socializing and emotional outbursts, but the ALJ observed that he was socially appropriate and cooperative while interacting with others at the hearing.  Compare AR 51 and AR 47.

While an ALJ can include personal observations of a plaintiff during a hearing, "a negative credibility determination based on those observations is proper only if it is supported by other evidence." Khavarian v. Colvin, 2017 U.S. Dist. LEXIS 92562, at *59-60 (S.D. Cal. June 15, 2017) (citing Nyman, 779 F.2d at 531).  Because this reason alone is not dispositive, the Court considers the ALJ's other reasons below.

## 2. **Reason Two**:  **The Quality of Plaintiff's Writing.**

The ALJ found that the quality of Plaintiff's writing in the FR (AR 211-20) and other prepared statements (AR 405-07) undermined the credibility of Plaintiff's

allegations of mental disability.  AR 29.  The ALJ found that these writing samples demonstrated Plaintiff's ability to work within the limits of the RFC because they showed the ability to "maintain concentration, persistence or pace" and demonstrated Plaintiff's ability to be organized, detailed, and persuasive.  Id.  The ALJ further highlighted Plaintiff's use of "vocabulary, grammar and sentence structure" as evidence for Plaintiff's mental capabilities.  Id.

Plaintiff's FR is printed simply and legibly.  AR 211-20.  It contains many sentence fragments and some misspellings (e.g., "challanging" and "handout with friends").  AR 211-12.  Some mistakes are crossed out.  AR 213-15.  Plaintiff fluctuates his use of the Oxford comma.  Compare AR 213, 215 to AR 211.

The ALJ also cited the written Statement of Claimant from August 18, 2014, in which Plaintiff wrote three pages to explain the hardships of his conditions.  AR 29, 405-407.  This document shows that Plaintiff could organize a longer series of thoughts and use complete sentences, although he does not divide his writing into paragraphs.

The Court agrees that the quality of the writing in the documents cited by the ALJ is inconsistent with Plaintiff having an IQ of 64, but it is not preclusive of Plaintiff having some mental impairments.  The Court, therefore, declines to find that the quality of Plaintiff's writing, standing alone, would be a clear and convincing reason to discount his subjective symptom testimony.

### 3.  Reason Three:  Inconsistency with Plaintiff's Daily Activities.

ALJs may consider contradictions between a claimant's reported limitations and a claimant's daily activities when assessing subjective symptom testimony.  Morgan v. Apfel, 169 F.3d 595, 599-600 (9th Cir. 1999) (claimant's "ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child" were inconsistent with disabling mental impairment); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (daily activities inconsistent with total disability undermined subjective testimony of disabling pain); Orteza v. Shalala, 50 F.3d 748,

750 (9th Cir. 1995) (claimant's ability to perform "various household chores such as cooking, doing the dishes, going to the store, visiting relatives, and driving" inconsistent with claimed inability to do light work).

The mere fact that a claimant can carry on some daily activities, however, does not defeat a claim of disability. Verigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (claimant's ability to "go grocery shopping with assistance, walk approximately an hour in the malls, get together with her friends, play cards, swim, watch television, and read" was not inconsistent with pain testimony where "these physical activities did not consume a substantial part of [her] day"). Moreover, a claimant may engage in activities like walking and swimming "despite pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved." Id. Thus, the relevant issue becomes whether the claimant's activities (1) contradict the Plaintiff's testimony, or (2) "meet the threshold for transferable works skills." Orn, 495 F.3d at 639; Derr v. Colvin, 2014 WL 5080437, at *12 (D. Ariz. Oct. 9, 2014) ("Only when a level of activity is inconsistent with a claimant's claims of limitations should those activities have any bearing on the claimant's credibility.").

Here, the ALJ found that Plaintiff's daily activities contradict Plaintiff's testimony and undermine his allegations of disability. AR 29. The ALJ noted that Plaintiff reported being able to maintain his personal care and hygienic need as well as cook, mow the lawn, iron, drive a car, go outside without assistance, socialize with friends and family, play basketball, handle his personal finances, and attend scheduled fitness classes with the public. AR 29. The ALJ also cited records that Plaintiff attended community college in 2015. Id., citing AR 424, 425 ("I am happy that I am in school and I got my own apartment.").

Plaintiff argues that these findings are insufficient because the ALJ "simply summarized Plaintiff's activities" without explaining the inconsistency. (JS at 21.)

The inconsistencies, however, are clear. Plaintiff claimed that he could not work in part because of inappropriate emotional outbursts, which is inconsistent with being able to interact appropriately with others while socializing, running errands, visiting the park, and taking fitness classes. Plaintiff claimed that he was too mentally impaired to do even simple work without special supervision, but that is inconsistent with driving, living independently, managing his own finances, and taking classes. Plaintiff claimed balance problems, which is inconsistent with playing basketball and walking dogs.

    **4.  <u>Reason Four</u>:  Inconsistency with Dr. Umugbe's Treating Records.**

The ALJ found Plaintiff's complaints inconsistent with Dr. Umugbe's mental health treatment notes from November 2014 and February, June and July 2015. AR 28, citing AR 422-29. These notes generally show that Plaintiff was upset over his divorce, his ex-wife's new boyfriend, and his poverty, and his mood improved somewhat with Prozac and counselling but worsened with marijuana use. Plaintiff denied hallucinations (AR 426), wanted to read an article on how to re-start life (AR 428), and rated his depression 3/10 when he was taking Prozac (AR 424-25). He largely attributed his low moods to his ex-wife's living nearby with her new boyfriend, not a brain injury from his 2008 car accident. The ALJ did not err by interpreting these records as inconsistent with Plaintiff's claims of disabling mental impairment.

    **5.  <u>Reason Five</u>:  Inconsistency with Work Record.**

The ALJ found that Plaintiff's "work record" showed that he could work within the assessed RFC. AR 28. The ALJ discussed Plaintiff's work at Home Depot (AR 25-26) and the ESA showing Plaintiff's "proven ability to perform a janitorial job" despite "complaints about the type of work and lack of interest." AR 26.

Again, the Home Depot records indicate that Plaintiff worked well with customers and fellow sales associates (AR 300) and that he voluntarily left his

position (AR 306). The ESA show that Plaintiff could do unskilled work but lacked motivation to pursue it. AR 232-37. The ALJ did not err in citing these records as undermining Plaintiff's claim of disability.

### 6. Reason Five: Inconsistent Statements.

The ALJ noted that while Plaintiff told Dr. Zhang that he suffers from daily auditory hallucinations (AR 411), Plaintiff denied "AU" [auditory hallucinations] to Dr. Umugbe (AR 422-23, 425, 429). AR 28. Dr. Zhang ultimately diagnosed Plaintiff as suffering from "psychotic features" (AR 413), whereas Canyon Ridge Hospital found "no symptoms of psychosis." AR 448.

The ALJ also noted that Plaintiff's "report that he was written up for inappropriate laughing and behavior towards customers is not supported by Home Depot employment records." AR 26. This is true, because his performance evaluations and disciplinary notices say nothing about inappropriate behavior towards customers. To the contrary, they said he "works well with customers." AR 300. He never received "needs improvement" for treating customers in a respectful, professional way, and he was rated as a "top performer" in that area during his last review. AR 300, 302, 304.

## VI.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: August 22, 2018

_Karen E. Scott_
_____
KAREN E. SCOTT
United States Magistrate Judge